GABRIEL W. COITE, TREASURER OF THE STATE OF CONNECTICUT, *vs.* THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY.

The act of 1865 provides that mutual insurance companies chartered by this state shall every year make return under oath to the state comptroller of the total amount of cash capital belonging to them on the first day of October, and that it shall be their duty to pay to the treasurer of the state a sum equal to one per cent. on such capital. Held that the tax was upon the franchise of the corporation and not upon its property as such, and that therefore such a corporation was not entitled to deduct from the amount of its capital so to be returned the amount of bonds of the state and of the United States held by it which were by law exempt from taxation.

The defendants were a mutual life insurance company, and on the first of October were chargeable with a considerable amount of declared dividends. These dividends were intended to be paid by applying them on premium notes, of

which the company held a large amount, and it was their practice to apply the dividends in this way at the maturity of the notes. The premium notes were not included in the return of its cash capital made by the company. Held that these unpaid dividends were not to be deducted from the cash capital in ascertaining the amount which was to be the basis of the tax.

The company also owed at the time a large amount of ascertained unpaid losses. Held that the amount of these should be deducted from the amount of the cash capital.

The statute provides that the treasurer and comptroller of the state shall be a board to examine and correct all statements returned to the comptroller for the purpose above mentioned, and that if such return should not be made or should in the opinion of the board be incorrect the board shall, within ten days after the time limited for making such return, make out such statement upon the best information they can obtain; that a copy of each statement approved, corrected, or made out by the board shall be sent by them to the corporation interested; and that their decision shall be final as to the value and amount of the property of such corporation. The defendants made a return on the first day of October, 1865, in the words following :—" Total amount of cash capital, (less $3,134,026 United States and state bonds) $1,994,799." It did not appear by the record whether any action had been taken by the board with regard to the return, but it appeared that the defendants had paid the tax to the treasurer upon the basis of the return as made. Held—1. That there was no presumption that the board had exercised its jurisdiction in the matter and that the burden of proof upon the point lay upon the defendants. 2. That any approval of the return by the board which might be inferred was to be regarded as an approval of the statement with regard to the whole amount of the cash capital, and was not to be taken as an approval of any deductions therefrom, a statement of such deductions not being an appropriate part of such a return. 3. That the provision of the act with regard to the sending of a copy of the approved or corrected statement to the corporation was merely directory, and the sending of such copy not essential to the validity of the proceedings.

Action upon the statute of 1865 with regard to the taxation of corporations; brought to the Superior Court in Hartford county, and tried on the general issue, with notice, closed to the court.

The statute referred to, (Gen. Statutes, tit. 64, sec. 48,) provides that " the secretaries, treasurers or clerks of the several insurance companies chartered by this state and conducted in whole or in part upon the plan of mutual insurance, shall, on or before the tenth day of October in each year, make returns and statements, under oath, to the comptroller of public accounts, of the total amount of cash capital, either invested or on deposit, belonging to said companies respectively on the first day of October in that year, being the pro-

ceeds of insurance upon the plan of mutual insurance; and each of said insurance companies shall pay to the treasurer of this state, for the use of the state, on or before the twentieth day of October in each year, a sum equal to one per cent. on its said capital; which shall be in lieu of all other taxes upon such capital except upon real estate held by such company, over and above what may be necessary and used by such company for the transaction of its appropriate business."

The defendants were a life insurance company incorporated under the laws of the state and doing business exclusively on the plan of mutual life insurance. On the 1st of October, 1865, they had policies of insurance outstanding to the amount of about sixty millions of dollars, upon the lives of about twenty-two thousand persons, all of whom were entitled to a participation in the profits of the business; and were the owners of property amounting in all, at a just valuation, to the sum of $5,179, 271$\frac{51}{100}$, and on the 9th day of October, 1865, the defendants made the following return, under oath, of their property, to the comptroller of the state, it being admitted that they acted in entire good faith in making the same.

" Office of Conn. Mutual Life Ins. Co., Hartford, Oct. 9, 1865.

" To THE COMPTROLLER OF THE STATE :

" SIR—The following is a true list or statement from this company, on the 1st day of October, 1865, as required by law :

| | |
|---|---|
| " Total amount of cash capital invested, less $3,134,026$\frac{80}{100}$ United States and state bonds, | $1,994,799.38 |
| " Total amount of cash capital on deposit, | 50,445.33 |
| | $2,045,244.71 |
| " Deduct ascertained unpaid losses, | 239,600.00 |
| | $1,805,644.71 |
| " Dividends declared, unpaid, | 175,006.00 |
| | $1,630,638.71 |

GUY R. PHELPS, *Secretary*."

Of the above mentioned $5,179,271$\frac{51}{100}$ the sum of $2,534,-026$\frac{80}{100}$ was invested in United States bonds and stocks of the various classes known respectively as "6's of '81," "5-20's," and "10-40's," and $600,000 was invested in six per cent. currency bonds of the State of Connecticut, which latter bonds were, by the terms thereof, exempt from taxation, and were issued under the acts of July 14th, and July 21st, 1865.

On the 1st day of October, 1865, there was due from the defendants to their policy-holders on account of ascertained losses, of which proofs had theretofore been furnished to the defendants, the sum of $239,600, all of which, by the terms of the policies, was payable within ninety days after proofs of loss furnished to the defendants, and all of this sum was in fact paid by the defendants before the expiration of ninety days from October 1st, 1865. There was also due from the defendants to their policy-holders at this time the further sum of $175,000, being the balance unpaid by the company to its policy-holders upon its fifty per cent. dividend declared in February, 1865.

The practice of the company is to insure for certain fixed premiums, payable one-half in cash and one-half upon an acknowledgment of indebtedness usually called a premium note. The premium notes held by the company on the first day of October, 1865, amounted to $3,010,123. The dividend declared in February, 1865, was intended to cancel, and did in fact cancel these premium notes, the practice of the company, for convenience to themselves and to their policy-holders, being to pay their dividends at the maturity of the premium notes. This $175,000 was, in due course of time, as the several annual premiums matured, and before the bringing of the present suit, paid to the several policy-holders, who had not before received the benefit thereof.

The rest of the property in the defendants' possession and belonging to them on the first day of October, 1865, amounted, at a just valuation, to the sum of $1,630,638$\frac{71}{100}$ and upon this amount the defendants, on or before the 20th day of October, 1865, paid the plaintiff as treasurer of the state, on

account of taxes for the year 1865, the sum of $16,306\frac{38}{100}$, being a sum equal to one per cent. on the sum of $1,630,638\frac{71}{100}$, and no other payment has ever been made by the defendants on account of taxes for 1865.

The present suit was commenced February 28th, 1866, by writ demanding $51,792 damages, and at the September Term of the Superior Court, 1868, the court, upon motion of the plaintiff, and against the objection of the defendants, allowed an amendment of the plaintiff's writ raising the damages to the sum of $103,585, in order to enable the plaintiff to recover of the defendants, if by law he was entitled thereto, a sum equal to twice the amount of one per cent. upon the sum of $3,548,632.80, which the plaintiff as treasurer of the state claims that he is entitled to recover, as a penalty under the statute.

The court made a special finding of the foregoing facts and reserved the case for the advice of this court.

*Hubbard,* for the plaintiff, cited *Commonwealth* v. *People's Five Cent Savings Bank,* 5 Allen, 428, 431 ; *Commonwealth* v. *Hamilton Co.,* 12 id., 301, 307 ; *Commonwealth* v. *Provident Institution,* id., 312, 315 ; *Nathan* v. *State of Louisiana,* 8 How., 80 ; *Coite* v. *Society for Savings,* 32 Conn., 173, 185 ; *Society for Savings* v. *Coite,* 6 Wall., 594, 606 ; *Provident Institution* v. *State of Massachusetts,* id., 611, 623 ; *Hamilton Co.* v. *State of Massachusetts,* id., 632 ; *Attorney General* v. *Bay State Mining Co.,* 99 Mass., 148, 153 ; *McCulloch* v. *State of Maryland,* 4 Wheat., 430 ; *Bank Tax Case,* 2 Wall., 200 ; *Portland Bank* v. *Apthorp,* 12 Mass., 252 ; *Manufacturers' Ins. Co.* v. *Loud,* 99 id., 146.

*Welch* and *Robinson,* for the defendants.

1. The Superior Court has no jurisdiction of the question as to the amounts or values upon which this tax was to be computed. By section 55th of the act with regard to taxes, (Gen. Statutes, p. 720,) the board of equalization, consisting of the treasurer and comptroller, was constituted a court with sole and exclusive jurisdiction over these returns and state-

ments, and vested with power "to examine and amend or correct all lists in such manner as they might deem just and equitable." And the act declares that the decision of this board in amending, correcting, approving, or making out such lists, "shall be *final* and *conclusive* as to the value of said property, * * *. upon which the respective taxes hereby imposed are to be paid." Viewing the return made by the defendants in the light of the purpose for which it was made, that is, as a statement of the taxable capital of the defendants, it is perfectly clear that the amount intended to be reported as the basis of taxation was the last sum stated in that return, viz: $1,630,638.71. The plaintiff, who was then chairman of the board, must have so understood it when it was made, and certainly he could not have understood it otherwise when the defendants in good faith paid the tax upon that sum. And yet it does not appear that this board has ever taken any action in the premises in the way pointed out by the statute, and in the absence of proof this court cannot infer that any such action was ever had. If anything at all is to be inferred, it must be that this board *approved* the return as it was intended and understood to be made, that is, a return of taxable capital to the amount of $1,630,638.71 only. But however that may be, no recovery can be had in this court until it is made to appear affirmatively that this board has established some different basis of taxation from that which has been acted upon in good faith by the defendants. It is unusual for the legislature to invest agents of the state with final determination of matters of fact. Tribunals for valuing and appraising property are sometimes, however, clothed with this power of final determination; as appraisers of land damages, and boards of relief, and this board of equalization. The determinations of the railroad commissioners have been made thus final by public act, and the power of courts to overthrow their decision was considered in the case of *The Town of Waterbury.* v. *The Hartford, Providence & Fishkill R. R. Co.*, 27 Conn., 146, and the court there holds that the Superior Court erred in attempting to review the decision of the commissioners. In *Goddard* v. *The Town of Seymour*, 30

Conn., 399, the court says :—" The law has constituted these officers (the assessors) and not judges of the Superior Court the tribunal to determine the valuation of taxable property." If this board had amended and returned the company's valuation, inserting the amount of federal and untaxable state bonds, and of ascertained losses and premiums declared and unpaid, the *company must have paid upon that basis*, and their decision could not have been contested by the tax-payers even in court, except by an appeal to their constitutional rights.

2. Even if the defendants' return is to be construed as reporting a larger taxable capital than that upon which taxes were in fact paid, still the plaintiff and comptroller have failed to comply with those requirements of the act which are essential to a recovery. By the act in question it is made the duty of the board of equalization to furnish the defendants, *before they become liable to any payments*, with a " true copy" of a list " as amended, corrected, approved or made out by said board," and which list so amended, &c., was made by said act " final and conclusive" as to the extent of the defendants' liability. The plaintiff seeks to recover a penalty of more than $100,000 in a case in which the defendants, without seeking to take any advantage of the plaintiff's laches, have voluntarily paid over $16,000, honestly believing that to be all which could under any circumstances have been required of them. We submit therefore that, under these circumstances, the rule of strict construction should be most rigorously applied. It was the defendants' right to receive the notification which the statute made conclusive as to the extent of their liabilities before becoming liable for this large penal sum. And we ask the court to hold that this notification was a condition precedent to the plaintiff's right to a recovery. The right of taxation is conceded in the text books to be inherent in the legislative power of the sovereignty, and this statute of taxation and the creation of this absolute board of assessors are acts of the same legislature and were enacted in the same chapter. Is there any logic which excuses these assessors, while other creatures of the legislature in assessing

property for taxation are held to the strictest fulfillment of prescribed duty? An unimportant delay of nineteen days by assessors in lodging their abstract of assessment with the town clerk, (although it was ten days before the session of the board of relief,) was held sufficient to make the entire assessment invalid. *Thames Manufacturing Co.* v. *Lathrop*, 7 Conn., .550. Upon the acceptance of that return it is of course fair to presume that the company, acting under their charter, have at the end of the year estimated their ability to make return of surplus premium to their 22,000 policy-holders from the *profits for the year*, and have declared their dividend accordingly. The dividend has been made, and can never be revised, and the loss of this penalty must fall, if at all, *upon a new class of policy-holders*, and the expenses of 1865 must be paid by the policy-holders of 1870, another body altogether. Can anything be more inequitable than this attempt of the plaintiff to repudiate his own acquiescence in the defendants' valuation?

3. But even admitting that the plaintiff's right to sue is not dependent upon any previous action of the board of equalization, still the plaintiff can not recover. And this brings us to the question as to the nature of the tax imposed by the law in question. Was this tax intended to be imposed upon the *franchise* or upon the *property* of the defendants? If it is to be considered a property tax, it will be conceded that the United States bonds cannot be included in the sum upon which taxes are to be computed. *Bank Tax Case*, 2 Wall., 208, 209; *Bank of Commerce* v. *New York City*, 2 Black, 620; *Provident Institution* v. *Massachusetts*, 6 Wall., 629; *Newark City Bank* v. *The Assessor*, 30 N. Jersey, 16, 22; *Monroe Savings Bank* v. *City of Rochester*, 37 N. York, 369. We maintain that the law in question clearly imposes a tax upon the property and not upon the franchise of the defendants. —(1.) By reference to sec. 5th of the tax law of 1865, it will be seen that divers expressions are used, showing that *property* and *values* are the subject matters therein considered. And herein this law differs widely from that under which the Savings Bank case came up. (a.) "Capital," signifying all

funds and property real and personal. *Mutual Ins. Co. of Buffalo* v. *Supervisors of Erie*, 4 Comst., 448 ; *New Haven* v. *City Bank*, 31 Conn., 106 ; *Bank Tax Case*, 2 Wall., 208. (*b.*) "Cash capital," signifying permanent productive funds, as distinguished from premium notes which were being gradually retired in the way of dividends. (*c.*) Capital " either invested or on deposit," and " being the proceeds of insurance," showing clearly that in laying this tax the legislature had in mind only *actually existing* and presumably *productive property.* —(2.) It was upon these funds, investments, and property that this tax was imposed. Nearly all taxes in this state are laid upon *property.* *Coite* v. *Society for Savings*, 32 Conn., 184. The court will therefore presume that the tax in question was intended to be laid in the same way, that is, upon property, unless the contrary intent *clearly* appears, either by the very text of the law, or by some *necessary* and not merely *supposable* or *possible* intendment. But the act itself, so far from indicating any intent to depart from the usual rule, in express terms imposes this tax directly upon the property. In requiring the defendants " to pay a sum equal to one per cent. on their said capital," (sec. 5,) it must be considered, as it was in the case below, that the legislature could not but have intended a tax upon the property in which the capital had been invested." *Bank Tax Case*, 2 Wall., 209. In that case the tax was " on a valuation *equal to the amount* of their capital paid in or secured to be paid in." And yet the court say " When this capital thus invested is *made the basis of taxation of the institutions*, there is great difficulty in saying that it is not the stock thus constituting the corpus or body of the capital that is taxed." Id., 208. To the same effect is the next phrase, " to be in lieu of all *other* taxes *upon such capital.*" In the savings bank section the phraseology is, " *other taxes upon said institutions.*" And then follows the clause, " *excepting upon real estate over and above*" &c., referring to the 23d section, where this real estate held in excess of the wants of corporations for their appropriate business is made listable and assessable in the town where located. The term *capital* then is qualified

by the exception, which is of course within the terms of the rule, and which is confessedly a property matter. But this intent is still more apparent in the 7th section of the same act, requiring that the "*lists*" made out by the defendants should be examined and corrected, as might be deemed just and equitable; by the same board of equalization who were required to "equalize and adjust the *assessment* lists of the several towns." (Gen. Statutes, p. 716.) This board was required to make a final and conclusive valuation of the *property* of the defendants. And the section concludes with a further and still more formal declaration that it was *upon* the "*property*" so valued that the taxes were by that act "imposed and to be paid." In view of the fact that these stringent provisions for *listing* and *valuing* the *property* of the defendants were first enacted in 1862, at the first session of the legislature after the passage of the law under which the United States bonds were issued and made non-taxable by or under state authority, can there be a doubt that the tax was intended, as the legislature declared, to be "imposed" upon the "property" of the defendants? *Commonwealth* v. *Hamilton Co.*, 12 Allen, 300. If the legislature had intended to impose a franchise rather than a property tax, it would seem natural that in subsequent legislation upon the same subject, after this question as to construction had arisen, the legislature would have either retained the former phraseology or adopted language more clearly indicative of that intent. But they did neither. In the similar acts of 1867 and 1869, (Session Laws, pp. 117, 303,) they use language and make discriminations which leave no room to doubt that the tax imposed is intended to be a property tax. In Massachusetts, when litigation had arisen upon a similar question, the legislature settled all doubts by enacting that "every corporation shall annually pay a tax upon its *corporate franchise* at a valuation thereof equal to the aggregate value of the shares" &c. Mass. Acts of 1865, ch. 208, sec. 5, p. 133. On the other hand our legislature has with equal certainty resolved all doubts by enacting that the defendants shall pay a tax upon the *balance of assets derived from the business of mutual insur-*

*ance,* after deducting from the total *assets* certain specified classes of property, and declaring that such tax " shall be in lieu of all *other taxes upon the assets*" of the defendants. Laws of 1869, page 303. It will be seen that the main objections urged against considering the savings bank tax a property tax are fully met in the provisions of law applicable to the defendants. There is a listing and return of " capital," " property," and " assets,"at a valuation, a revision and amendment of that *list* and a final and conclusive *re-valuation* of the *property* and *assets* therein reported by the highest board created for such purposes in the state, and a severe penalty for non-compliance, for the payment of which the entire *assets* of the defendants, taxable and non-taxable, are liable. The only other objection is, as we have seen, equally applicable to many other acts then and formerly in force and clearly imposing a property tax. The cases which have arisen in other states most nearly analagous to the one at bar sustain the construction for which we contend. *Bank Tax Case,* 2 Wall., 208; *Bank of Commerce* v. *New York City,* 2 Black, 620; *Newark City Bank* v. *The Assessor,* 30 N. Jersey, 22; *Monroe Savings Bank* v. *City of Rochester,* 37 N. York, 369; *British Commercial Life Ins. Co.* v. *Commissioners of Taxes,* 28 Howard Pr. R., 41, 57, 59; *Frazer* v. *Seibern,* 16 Ohio S. R., 622; *Whitney* v. *City of Madison,* 23 Ind., 336.—(3). The character of these corporations is such as to qualify the tax as one upon their property and not upon their franchise. Mutual life insurance companies are peculiar corporations. They are only partnerships organized as corporations for reasons of convenience. They are not trading institutions. Nor institutions for money making. They are organized for benevolence, and to provide against want. Their franchises are liable to total defeat. They are not necessarily perpetual. If all the members of corporations having franchises worthy of taxation, as railroad companies or savings banks, were swallowed by an earthquake, they would leave *successors.* If the members of these corporations failed at any time to keep up their policies, the concern immediately dies and leaves no corporate heir, excepting the sovereignty. The business has

even been sacred from the sharp pursuit of the internal revenue acts, excepting the trivial item of stamps. Their business and their dividends have not been called to pay tribute to the general government. And the Supreme Court of Massachusetts, in *Commonwealth* v. *Berkshire Life Ins. Co.*, 98 Mass., 28, hinge their decision of the case upon the reluctance of the state to impose taxes upon this class of benevolent associations.—If we are right in the construction claimed by us, then clearly upon all the authorities these United States securities ought not to have been included in the aggregate sum upon which taxes were to be computed. And if these securities are to be deducted, no further argument need be urged in favor of a like exemption of the non-taxable state bonds. In *Newark City Bank* v. *The Assessor*, 30 New Jersey, 16, upon the question of including in tax lists certain New Jersey bonds, the court say: "By the act authorizing their issue they are expressly exempted from taxation, for the purpose of increasing their negotiability, and have been issued bearing on their face a statement that they are free from taxation. The express contract of the state that they shall be exempt is enough to settle this question. New Jersey has always preserved unsullied her good faith, whenever it has been pledged, and her courts will never by any nice refinement open a way in which it may be violated." The state bonds in question were issued under a precisely similar law, (Acts of 1865, pp. 82, 131,) and it is to be presumed that this court will be no less jealous for the honor and good faith of this state. *Society for Savings* v. *New London*, 29 Conn., 193.

4. The amount of ascertained and unpaid losses, $239,600, and the amount of dividends due but unpaid to policy-holders, $175,000, were properly deducted from the gross value of investments and cash on deposit. They are not taxable within the statute. The tax is upon the "cash capital, being the proceeds" of insurance. The term "proceeds" is evidently used in the sense of *net balance*, and the very term "balance" is used in the act of 1869. These amounts are no part of the company's capital. They are vested in classes of partners away

from the community of the corporation, and are simply held by the company upon trust to pay over. The ninety days are but grace allowed for proper inquiry. The beneficiaries of these policies are retired partners, no longer contributing premiums; and with a share in the capital severed from the common fund. The dividends also belong to the several policy-holders, and not to the company. They were declared in February, eight months before the return, and were then due; simply to accommodate the company's bookkeeping, and the 22,000 policy-holders, actual payment is made when the several premiums mature. The very term "dividend" implies a severance from the common corporate estate. Thus it has been held "that the right of each shareholder to a dividend declared is entirely separate from and independent of that coming to other shareholders." Carpenter v. N. York & N. Haven R. R. Co., 5 Abbott Pr. R., 277. And again, that a "dividend once declared becomes a debt due to each individual shareholder." King v. Patterson & Hudson River R. R. Co., 5 Dutch., 504. The losses ascertained before October 1st are no more a part of the capital than those which have been paid previously. And the same is true of the dividend. The People v. Ferguson, 38 N. York, 91. Each is a liability and not a part of the capital. And these losses and dividends have been in fact paid to their owners.

5.  No penalty can be recovered in this case because the suit was not brought in time. Drake v. Watson, 4 Day, 37. The amendment made September Term, 1868, in order to enable the plaintiff to recover of the defendants this penalty, was equivalent to the institution of a new suit, which could not have been brought for that purpose at that time.

6.  No recovery can be had because the act under which this claim is said to have accrued has been repealed. Gen. Statutes, 742; Acts of 1867, p. 117, and of 1869, p. 304.

LOOMIS, J.  That part of the declaration which claims a forfeiture, provided by the statute, for the neglect of the defendants to pay the tax in question, was waived by the plaintiff's counsel during the argument, and the only question

presented for the decision of the court is, whether the de-
fendants are liable to pay the tax claimed to be due to the
state, pursuant to the provisions of the following statute :

"The secretaries, treasurers, or clerks of the several insur-
ance companies chartered by this state, and conducted in
whole, or in part, upon the plan of mutual insurance, shall,
on or before the tenth day of October in each year, make re-
turns and statements under oath; to the comptroller of public
accounts, of the total amount of cash capital, either invested
or on deposit, belonging to said companies respectively on the
first day of October in that year, being the proceeds of insur-
ance upon the plan of mutual insurance ; and it shall be the
duty of each of said insurance companies to pay to the treas-
urer of this state, for the use of the state, on or before the
twentieth day of October in each year, a sum equal to one
per cent. on its said capital ; the same to be in lieu of all
other taxes upon such capital, except any and all real estate
held by such company over and above what may be necessary
and used by such company for the transaction of its appro-
priate business." Acts of 1865, p. 118, § 5.

The defendants undertook, doubtless in good faith, to com-
ply with the requirements of the above statute, and returned
to the comptroller, under oath, a statement as follows:

"Office of Conn. Mutual Life Ins. Co., Hartford, Oct. 9th, 1865.

"To the Comptroller of the State : Sir : The following is
a true list or statement from this company, on the first day
of October, 1865, as required by law :

| | |
|---|---:|
| "Total amount of cash capital, invested, less $3,134,026$\frac{80}{100}$ United States and state bonds, | $1,994,799.38 |
| "Total amount of cash capital on deposit, | 50,445.33 |
| | $2,045,244.71 |
| "Deduct ascertained unpaid losses, | 239,600.00 |
| | $1,805,644.71 |
| "Dividends declared, unpaid, | 175,006.00 |
| | $1,630,638.71 |

Guy R. Phelps, *Secretary.*"

The above return, containing as it does a statement from which "the entire cash capital, invested or on deposit," may be readily computed, must be considered a substantial compliance with the law in that respect. The entire cash capital thus returned amounts to $5,179,271\frac{61}{100}$; but the defendants, instead of paying the prescribed tax of one per cent. upon the above sum, first deducted $3,134,026\frac{80}{100}$, invested in United States and state bonds, and $239,600.00 for ascertained unpaid losses, and the further sum of $175,006.00 for dividends declared and unpaid, making in all the sum of $3,548,632\frac{80}{100}$; and paid to the treasurer of the state a tax equal to one per cent. on $1,630,638\frac{71}{100}$ only. It will be observed that the law allows no deduction on account of the character of the investments, or for any other cause; but requires in direct and positive language the payment of a tax equal to one per cent. on the entire cash capital, either invested or on deposit, being the proceeds of insurance upon the plan of mutual insurance. It is manifest that the payment above mentioned, as made by the defendants, is no sufficient compliance with the obvious meaning of the statute referred to; for this law in its provisions is so independent and exceptional as regards our general system of taxation, that it cannot by any rational construction be considered subject by implication to the general provision in the statute exempting United States securities and state bonds from being included in personal property for purposes of taxation. There are certain corporations that are required by the provisions of section 10 of General Statutes, p. 709, to put into the list their whole property, both real and personal, "in the same manner and to the same extent as individuals resident in this state." Such corporations would have the benefit of the exemption mentioned; but insurance companies, savings banks, and divers other corporations therein named, are expressly excepted from the operation of the provisions of this section, and reserved for another distinct, peculiar and exceptional mode of taxation.

If the law is valid, requiring the payment of a sum equal to one per cent. on the entire cash capital, it follows that an additional sum is still due from the defendants.

The main issue relates to the liability of the defendants to pay the required percentage upon that part of their cash capital invested in government stocks; and the question is, whether the statute making such requirement is valid.

If the tax in question is to be regarded as a property tax, based upon the securities of the United States, it is in direct conflict with the paramount laws of Congress exempting such securities, and is, therefore, unconstitutional and void. But if it can be regarded as a franchise tax, that is, a tax upon the corporation itself, as a creature of the state, then it is valid, irrespective of the fact that a portion of the cash capital has been invested in federal securities; for " nothing is more certain in legal decision than that the privileges and franchises of a private corporation and all trades and avocations by which the citizen acquires a livelihood, may be taxed by a state for the support of the government, and this authority resides in the state independently of the federal government." *Society for Savings* v. *Coite*, 6 Wall., 594; *Provident Institution* v. *Massachusetts*, 6 Wall., 611; *Hamilton Company* v. *Massachusetts*, 6 Wall., 632.

In order to determine to which class the tax in question belongs it will be necessary to give a construction to the statute, and in so doing it will be the duty of the court to presume, unless the language is clear and explicit to the contrary, that in enacting such a law, the legislature was exercising its admitted rightful authority, rather than usurping the functions of the general government.

If the law in this case cannot be considered as imposing a franchise tax it will overthrow a portion of the statute, for we have seen that the act does not contemplate that any deductions may be made from the entire cash capital.

In this case we need not rely on any mere presumption, for there is something more than the mere absence of words clearly importing that a property tax was intended. The rules prescribed in several well-considered cases enable us to recognize in the statute in question the ordinary and most significant features of a franchise tax. *Coite* v. *Society for Savings*, 32 Conn., 173; *Society for Savings* v. *Coite*, 6

Wall., 594 ; *Provident Institution* v. *Massachusetts*, 6 Wall., 611 ; *Hamilton Company* v. *Massachusetts*, 6 Wall., 632 ; *Portland Bank* v. *Apthorp*, 12 Mass., 252 ; *Commonwealth* v. *People's Five Cent Savings Bank*, 5 Allen, 428 ; *Commonwealth* v. *Provident Institution*, 12 Allen, 312 ; *Commonwealth* v. *Hamilton Company*, 12 Allen, 298 ; *Manufacturers' Ins. Co.* v. *Loud*, 99 Mass., 146 ; *Attorney General* v. *Bay State Mining Co.*, 99 Mass., 148.

We discern no substantial distinction in principle between this case and that of *Coite* v. *The Society for Savings*, decided by the Supreme Court of this state, 32 Conn., 173, and by the Supreme Court of the United States, 6 Wallace, 594.

The act which received a judicial construction in the latter case provided that the treasurers of all savings banks and savings and building associations in the state, should, within a specified time, return under oath to the comptroller of public accounts " statements of the total amount of all deposits and stock in said institution" on the 1st of July in each year ; and that said institution should " pay to the treasurer of the state, for the use of the state, a sum equal to one-half of one per cent. on the total amount of deposits and stock in such institutions, on the first day of July in each year," which tax was " to be in lieu of all other taxes upon said institutions, and the deposits therein," with a proviso that the act should not exempt from taxation any real estate held by such institutions, " over and above what might be required for the transaction of its appropriate business." Acts of 1862, chapter 55, sec. 1. By an act passed in May, 1863, the tax was made three-quarters of one per cent. instead of one-half of one per cent.

This act was decided by the highest courts, both of this state and the United States, to be a tax upon the privileges and franchises of the corporation as such, and not upon its property, and therefore the bank was not allowed to deduct from its deposits the amount invested in the securities of the United States.

It seems to us that the same construction must be placed upon the statute now under consideration. We find that

savings banks and insurance companies are coupled together in section 10 of the General Statutes. p. 709, and there excepted from the obligation imposed on other corporations, to list their whole property in the same manner and to the same extent as individuals; thus setting these institutions apart from the general system of property taxation. And we find that both institutions became subject to this exceptional mode of taxation at the same time, by virtue of the same act, passed in 1851, which act in its controlling phraseology was the same as now.

In the same year also we witness the discontinuance of the ancient policy of the state, which taxed the private citizen for his "faculty" or occupation, and observe the introduction of a system, since followed and extended, of duties on corporate franchises.

These institutions also appear together in several subsequent statutes which the legislature has from time to time passed as substitutes for the original act, when it was deemed desirable to change the required percentage, or subject other corporations to the same mode of taxation. See Acts of 1862, chapter 55, which is the act under which *Coite* v. *Society for Savings* arose and was decided. Also acts of 1864, chapter 74, and General Statutes, p. 716, sec. 44, and p. 718, sec. 48.

Again, upon comparing the acts relative to savings banks and insurance companies, we find that both must make return to the comptroller and payment to the state treasurer in precisely the same manner, which is quite unlike the mode of property taxation. In both the tax paid is to be in lieu of all other taxes, with the same exception as to real estate over and above what is necessary for the appropriate business of each. There is, however, a difference in phraseology in this —that in the case of savings banks the tax paid is "to be in lieu of all other taxes upon said institutions and the deposits therein," while in the case of insurance companies it is "in lieu of all other taxes upon said capital." Both refer to the subject matter upon which the percentage is computed, and the addition of the word *institutions* in the case of savings banks surely is not sufficient to control or change the construc-

Vol. xxxvi.—67

tion of the act. In both cases the same significant phraseology is employed to indicate the amount of the tax. It is not a percentage on the capital in one case, or deposits in the other, but "a sum equal to" such a percentage, showing that capital and deposits are employed as a standard of reference by which the tax on the franchise may be measured by the products of the franchise. In the case of savings banks the amount of the tax is a sum equal to the specified percentage on the total amount of deposits ; in the case of the defendants it is equal to the percentage on the total amount of cash capital, being proceeds of insurance. In both cases the tax bears a more just proportion to the value of the franchise than would have been possible if an arbitrary sum had been prescribed.

There is as much similarity in the basis upon which the tax is computed, and in the language of the two acts, as could be expected in levying the same kind of tax upon dissimilar institutions. "The cash capital, being proceeds of insurance," bears a similar relation to the insurance company, for the purposes of taxation, that deposits do to the savings bank. In both the cash paid in is held by the corporation for the benefit of those who paid it. The savings bank, by receiving money on deposit, incurs the obligation to account for the net earnings, and return the principal when demanded, subject to the prescribed regulations. The insurance company also must account for the earnings to those who pay the premiums, and must return the amount of money named in the policy, upon the happening of the contingency therein mentioned. In both cases the cash paid in constitutes the principal fund from which investments are made, and is to be considered " capital" only in a limited sense. In the case of the insurance company the word " capital," as used in the statute, adds nothing to the meaning. If this word had been omitted, the phrase " total amount of cash proceeds of insurance" would have signified precisely the same thing. In neither case is there any valuation of property as such, to form the basis of taxation, but a mere counting of the money deposited in one case, and the amount paid in for insurance

in the other, and for the same purpose in both cases, of furnishing an equitable standard by which to determine the amount of the tax. The state asks merely for the prescribed percentage, and that too in a manner as irrespective of actual investments as if it was a duty on the gross cash receipts or income. In the case of both these institutions nearly all the funds will be found invested in some tangible property, the real value of which may not be correctly represented by the amount originally invested, and yet the law takes no notice whatever of the character and value of the investments. This would be an anomaly in any system of property taxation.

It is also to be observed that only a part of the property of either of these institutions is subject to taxation under the laws we are considering. This is especially true of the insurance company, and if the act in question is to be construed as imposing a tax upon property as such, it is passing strange that it should overlook, and indeed exclude from taxation, the sum of $3,010,123\frac{80}{100}$ in premium notes, good and collectible, held by the company, and which in other cases would be subject to property taxation, and at the same time include for taxation $2,534,026\frac{80}{100}$ invested in United States bonds which are expressly exempt from property taxation, not only by the laws of the United States but by our own statute also.

For these reasons we regard the above mentioned case of *Coite* v. *The Society for Savings* as entirely decisive of the question now under consideration, so far as it relates to the exemption of United States securities and the nature of the tax. We therefore hold that the amount invested by the defendants in United States bonds cannot be deducted from the entire amount of their cash capital, in order to reduce the amount of their tax, because the tax in question is not a property tax.

The subject of state bonds was not involved in the case of *Coite* v. *The Society for Savings*, but the same reasoning which there prevailed leads inevitably to the conclusion that no exemption can be claimed by the defendants on account of their ownership of the bonds of the state. The statute which exempts state bonds from taxation is no more explicit and

positive than that which exempts the securities of the United States. It does not, by its terms, or by implication; impair in any way the right of franchise taxation.

The tax making the exemption (being a property tax), and the tax imposing the duty to pay the required percentage on the capital (being a franchise tax), are not inconsistent with each other, and both may stand together.

If the statutes imposing these two kinds of taxes were inconsistent, then the argument as applicable to state bonds would be different from that relative to United States bonds in this, that the later state law imposing the tax would repeal the former law of the state making the exemption, but the state law imposing the tax, if in conflict with the United States law exempting the securities of the United States, would be null and void.

The remaining question relates to the claim of exemption on account of ascertained and unpaid losses, and dividends declared but unpaid. But here the principles we have hitherto discussed as applicable to government securities do not apply. The simple inquiry is, whether these two items are within the terms of the statute.

The losses evidently constitute no part of the cash capital, but on the other hand, being fixed liabilities, owing by the corporation, they do and should abate by so much the amount of cash capital belonging to the company. The term " proceeds of insurance," which qualifies and limits the meaning of the term " cash capital," as used in the statute, it seems to me should be construed as importing the same as " net proceeds," or balance. The defendants, therefore, were right in deducting these losses.

At first blush it would seem that dividends declared should also follow the same rule. If they were declared and payable in such manner as to reduce the cash capital, they should of course be deducted. The general rule is that a dividend once declared becomes a debt due to the person entitled to it and an obligation from the corporation declaring it. Such would always be the case where there was no contract between the parties modifying their respective rights and liabilities. In

this case the facts are such that it is difficult to see how it is possible that the dividends in question could reduce, or in any way affect, the amount of cash capital.

It is found that the dividend in question was intended to cancel, and did in fact cancel, the premium notes, and that the practice of the company, both for their own convenience and that of their policy holders, is, to pay the dividends in this way, at the maturity of the premium notes. The dividends then are not to be paid as the losses are paid; they do not come out of the cash capital at all, but out of the notes. The parties so understand it, and contract with reference to it. The premium notes constitute no part of the cash capital. It is found that in this case these notes amount to $3,010,123\frac{80}{100}$, and that they are not included in the return made by the defendants. If they were included, then the dividends should have been deducted. Had the dividends declared canceled the entire amount of premium notes, the cash capital to be returned would have been the same, though it is obvious that the non-taxable assets of the company would have been by so much diminished.

How is it then that dividends which do not come out of the cash capital in fact, can be deducted for the purpose of reducing taxation? If the dividends declared, canceling the premium notes, should be considered equivalent to a collection of those notes, then, if the amount so collected should be returned as a part of the cash capital, the dividends would be properly applied to reduce it. This would be merely adding the amount of the dividend and then subtracting it again; but in the case before us the amount collected by dividends upon the premium notes was never added to the capital as returned, and to deduct the amount would be simply to withhold so much from taxation.

The foregoing discussion leads to the conclusion that the defendants are required, by the terms of the statute, to pay the prescribed tax upon all the items mentioned in the return, except the unpaid losses, unless certain technical objections urged by the defendants against a recovery in this case should prevail, which objections we will now proceed to consider.

1.   The first objection, " that the Superior Court has no jurisdiction of the question as to amounts or values upon which the tax was to be computed," is avoided by the construction we have given to the return made by the defendants. We hold that the return discloses the entire cash capital, and is therefore such a return substantially as the law required; that the deductions made by the defendants may be, and should be, disregarded as wholly unauthorized; and that the return reports a larger capital than that upon which the taxes were in fact paid.   The Superior Court has not therefore attempted to exercise any such jurisdiction as the objection assumes.

2.  . The second objection is, that the treasurer and comptroller of the state, who constitute the board of equalization, have failed to comply with those requirements of the act which are essential to a recovery.   This objection is based upon the requirements of section 7 of the acts of 1865, chapter 116, which provides that it shall be the duty of this board to examine and amend or correct all lists and statements returned to the comptroller, in such manner as they may deem just and equitable; and in case any person shall fail to make the required return, or shall, in the opinion of the board, make erroneous returns, it shall then be the duty of the board to make out a list or statement, which shall be final and conclusive, and a true copy of each list and statement as amended, corrected, approved or made out by the board, is to be returned to the officer whose duty it was to have made such return in the first instance.

In this case the record fails to show whether or not there was any action on the part of the board of equalization relative to the list or statement in question, and the pleadings and notice of the defendants do not indicate that such a defence was to be made.   It appears that the defendants paid a part of the tax based upon this list, and it is obvious that they declined to pay the balance from an honest belief that the law making the requirement was not valid.   If, however, the defendants are correct, that it is necessary for the plaintiff to show affirmatively, as a condition precedent to the

plaintiff's right to sustain the suit, that there was such action on the part of the board, it will be fatal to the case; or, if there has been a decision of the board relative to this return, it is by the statute conclusive as to value and amount.

But, as we construe the statute, the board is not required to take any action relative to amending the list returned, or making a new one, except in two specified contingencies; 1st, when the corporation fails to make any return within the time and in the manner prescribed; and 2d, when, in the opinion of the board, the return as made is erroneous. These two conditions are essential to give the board jurisdiction to make a different return from that made by the defendants. There is no presumption that the board ever exercised such a jurisdiction, and therefore, if the defendants rely upon any action of the board, as concluding the parties relative to the list, it is for them to prove it as matter of defence, and it is not a condition precedent to the plaintiff's right of action.

If, as in this case, the record does not indicate that any action has been taken by the board, it should be presumed, for the purposes of the case, that the list, so far as it discloses the amount of cash capital invested or on deposit belonging to the corporation, stands approved. But this list is not to be taken as approved in respect to statements and deductions which the law does not make essential or appropriate parts of such return. The law requires certain specific facts to be reported, and the return, so far as it is pertinent to the requirement, stands approved unless amended by the board, but not the claims for exemption which the party making the return may insert therein, nor the subtractions from the cash capital that may appear thereon as made by such party.

Again, it is said that it does not appear that the board sent any copy of the statement or list in this case to the defendants, and that this omission is fatal. The statute, after prescribing the duty of the board in the two specified instances, to amend the list, or make a new one, makes the following direction:—" and a true copy of each list and statement as amended, corrected, approved or made out by said board, shall be returned" to the officer who is required to make such

statement. It will be seen that the phraseology here employed to describe the copy to be sent, is broader than the duty previously mentioned, upon which the sending of the copy is predicated, and if we give to the word " approved" its most appropriate meaning, it would seem to require the board, where they make no amendment of the list, to send back a copy of the return as made by the defendants, with their approval indorsed thereon. If such should be deemed the true construction of this clause, then we hold that it is merely directory, and not essential to the validity of the proceedings. It is obvious that this entire section of the statute was intended for the benefit of the state alone; the power to examine and amend the return, or make a new one, was reserved by the state exclusively for its own protection, not to reduce the list, but to insure the return of the entire cash capital.

There is no good reason for sending a copy of the list to the defendants where no change is made, for the defendants are presumed to be prepared to pay according to their own return and statement.

The object doubtless was, to give notice to the defendants where the return was altered as to amounts or values. The duty to send the notice is dependent on, and pursuant to, the action required on the part of the board, which, as we have seen, is confined to the two hypothetical cases mentioned; and it is no part of the duty of the board, unless such duty is to be implied from the clause we are considering, to approve of the list as made by the defendants. The words used in this statute referring to the copy to be sent, are not all needed to convey the meaning; they are loosely used, and it seems reasonable to restrain the meaning of the word " approved," so as to import merely that the board officially sanction such a statement or list, as the copy returned by them may indicate, rather than construe it so as to require the board to give notice to the defendants that they have attended to a matter not required of them, and that they approve of the defendants' own statement. It is not however necessary for the purposes of this case to give the above as the true construction of the statute; but we employ the reasons above stated

as fully justifying our conclusion, that if the statute can be so construed as to require the copy of the list to be sent in a case like the present one, it must be construed as directory merely, and that the omission to send the copy does not excuse the non-payment of the tax.

3. The remaining objection to be considered is, that the act passed in 1865, under which this claim accrued, has been repealed, either by the revision of 1866, (General Statutes, p. 742, sec. 1,) or by the act of 1867, (Acts of 1867, chap. 118, sec. 3,) or by that of 1869, (Acts of 1869, chap. 79, sec. 3.)

We do not consider this objection well founded. It is true that the law of 1865, upon which this suit is founded, has been repealed, but the rights of all parties under it have been most carefully reserved and protected, so that for the purposes of this case the law of 1865 continues in full force.

The committee to revise the statutes reported to the legislature, at its May session in 1865; but that report did not include the laws passed at that session; and the legislature passed an act providing that the revised acts then reported, together with the acts of that session, to be revised by the committee and incorporated therewith, should constitute the General Statutes of the State of Connecticut, on and after the 1st day of January, 1866, and that all other public acts, with certain specified exceptions, should be repealed. The revising committee, pursuant to this authority, did incorporate the laws of 1865 with the other acts reported, and the particular act we are considering became section 48th of the General Statutes, p. 718.

The act of 1865 operated by its own force till the revision took effect on the 1st of January, 1866, and after that the same act continued in force as section 48 until the act was passed contained in the laws of 1867, chap. 118, sec. 3, which expressly repeals section 48, but at the same time provides that " such repeal shall not in any way affect any suit now pending, or the validity of any claim of the state under said act now existing." The act, too, of 1869, as found in the laws of that year, chap. 79, sec. 3, repeals the first and second sections of the act of 1867, but contains a saving clause,

identical with that contained in the repealing clause of the act of 1867.

The right of the plaintiff, therefore, to recover the tax in question, has not been in the least impaired..by any of the repealing acts referred to, and we advise the Superior Court to render judgment in favor of the plaintiff, to recover of the defendants the amount of the tax due from them upon the principles we have endeavored to explain.

In this opinion BUTLER and CARPENTER, Js., concurred.

PARK, J.  I concur in the foregoing opinion because I can not distinguish the case in its essential features from that of *Coite* v. *The Society for Savings*, in which this court sustained the legality of a tax like the one here in question, and which decision was affirmed by the Supreme Court of the United States.  In a case like this, where a law of a state comes into apparent conflict with a law of Congress, the decision of the Supreme Court of the United States sustaining the state law may well be regarded as settling the question beyond further controversy, and I do not therefore press further the views which I expressed in the dissenting opinion in the case referred to.  I think however the cases have gone too far in holding United States bonds, which by act of Congress are exempt from taxation, practically open to taxation by a tax laid upon a franchise, the amount of which depends on the amount of the assets of a corporation without reference to the character of the assets; and that in any analagous cases that may arise we should incline to recede from the ground taken rather than advance further in the same direction.